All right, are we ready to proceed? Then I will call the first case, United States v. Xian, number 221030. May it please the court, my name is Howard Pincus from the Federal Public Defender, and I represent Huishan Jiang. None of the four disputed matters on which the district court denied a safety valve eligibility can justify that result. They are either clearly erroneous, or not legitimate cases for denying eligibility, or both. This court should vacate Mr. Xian's sentence and demand a re-sentencing without regard to the statutory minimum. The parties agree that there are three reasons specific to Ms. Jiang that cannot justify denying safety valve eligibility to Mr. Xian. These are matters on which the district court disbelieved Ms. Jiang's hearing testimony. It was that she never saw anyone in the Glencoe house, that she had no idea and no belief that there was marijuana in the Glencoe house, and that she had only signed a check for a utility bill and did not write anything on the check. That narrows the dispute here to four matters. The first is that the proffer, according to the district court, ignored the utility bills. But the proffer did not. The proffer was clear that Ms. Jiang, and here too any issue, was only asked to heard. Pay only one utility bill. The proffer later said that she was asked to pay a bill on one occasion that she did. And when the prosecution, in response, raised the issue of similar writing on the checks and money orders, the supplemental response said Ms. Jiang, quote, was asked to pay a utility bill once and she did. That was denial of paying the bill at any other time. And especially in light of the prosecutor's concerns, it provided exactly what the district court said it would expect if Ms. Jiang had not paid any utility bills. Namely, that she said she didn't write any of the money orders. And saying she paid the utility bills only once and with a check was a denial of any other writing, any other paying the utility bill. The second issue that the court, the second finding that the district court made was about the ignoring of the issue of a debt to Mr. Jiang for. The district court's problem with that was that the proffer did not specify that the debt was repaid and did not specify the amount of the debt. The district court was wrong about the repayment. The proffer later very clearly said that the couple could not agree to pay it all at once and agree to pay installments. And that there was one check written for an installment. But nobody said how much the debt was. And nobody said how they happened to bump into these people and suddenly got money from them for an immigration lawyer. And nobody said anything about really having any knowledge of the conspiracy that they were convicted of. He smelled marijuana. He thought it was, but he was, he didn't want to say anything. But he said he definitely knew in the proffer that it was marijuana. He said at the hearing, he definitely believed it was marijuana in the basement. Does that make him guilty of a conspiracy? Does he have any knowledge that it was marijuana? Well, whether the jury could convict him of it, whether he was actually guilty of it are two separate questions. They didn't testify at the trial. That's correct. So just because they were convicted based on evidence that did not include their testimony doesn't mean the proffer was false. Well, it may not have been false for what it said. But there was an awful lot that it didn't say that it should have said. Well, in terms of trying to answer the first point you made, which was about the amount of the debt. It's true that the proffer letter didn't say the precise amount of the debt. But what was important, what was material, is whether the debt was substantial. And the fact that it was for an immigration lawyer marked it as substantial. How they got in touch with Mr. Ginn was set out in the proffer letter. So the proffer letter does explain they came to Denver. They stayed at the Danforth house and that they were introduced to Mr. Ginn and that he was helping them with the immigration process. They borrowed money so that he could pay for a higher lawyer to represent him. That was necessarily a substantial debt. And the fact they hadn't repaid it also shows it was substantial. And the proffer letter, again, is clear that they did make a payment and they agreed to pay installments, plural. So clearly the debt had not been repaid. Do we know the frequency of those installments and how many installments were missed? Do we know any of that? We don't know how often the installments were supposed to be made. Or whether they were missed or current? No. All we know is that they were going to pay installments. And they paid one installment. That's all we know. They paid one installment. Right. And that, if you had to pay installments and you pay one installment, then clearly the debt hadn't been repaid. And the district court was concerned about it because the notion was that or the proffer letter said we stayed rent-free so that we could pay back the debt. So they're paying back the debt. They only made one installment. That showed why they were staying rent-free at the house. Of course, staying rent-free would always be a benefit, but this was a means that would enable them to have more money to pay back the debt. And the fact that they had other ongoing obligations like a second car that they bought and the expense of living, two children, and the expense of fuel at Denver, they had only made the one installment. But the district court's concern was we don't know if the debt was repaid in full, and it clearly wasn't. The next finding the district court made was that how they came here was, at the hearing, different than what was said in the proffer letter. It was Ms. Jong again who testified to these matters, and she talked about how they weren't really related to the Danes, although the proffer letter said they were, and there were some inconsistencies about communication from China between the proffer letter and her testimony. Again, only as to her. But in both the proffer letter and the hearing testimony, it was clear that it was not only they had some invitation from the Danes, but also they came here for a sightseeing trip. The district court said, well, at the hearing, it's that they came here for a sightseeing trip. But the proffer letter talked about the invitation to visit from the Danes, but also that they came here for a sightseeing trip. And then, when they were here, decided to get in touch with the Danes. And that was what Ms. Jong testified to at the hearing. But the problem there was it makes it sound like the meeting with Mr. Ding was just spontaneous at the last minute in the middle of their sightseeing trip, whereas it appears there was a motivation for coming over at all. Well, both of them talked about the contact with the Danes beforehand. If there is a difference in emphasis there, again, only from Ms. Jong's testimony, and more importantly, it's not material. What matters is what Mr. Xian had to do was provide truthful and complete information about the offense and relevant conduct. So is there— The back story is neither of those. And he didn't. What he said was implausible. They just wandered in on tour. They're going to go see folks that they didn't know, really. They're going to live in their houses for free. They didn't know there was an illegal operation going on. I mean, can a judge look at that and say, you know, this just isn't—won't work? If the judge wanted to say, for example, I don't find what you're saying here credible, and I therefore disbelieve everything you said, the judge can do that. The judge here didn't do that, but he could have. He didn't. And in terms of coming here and getting in touch with somebody who they do happen to know, who lives in Denver, and leading the tour trip when they decide that America is perhaps the place they want to stay, it's not inherently implausible. I mean, they're coming from communist China. They come here. They find the life much better. They decide to go visit the only people they have any connection with in this country. And when they get there, they stay at their house. And then they decide that, you know, I'm really going to stay. And they introduce an immigration lawyer. They take out a loan from Mr. Denford to help pay for the immigration lawyer. And they're living at the houses. Now, as Mr. Sheehan said at the hearing, he later realized, or now realizes, that their living in the houses was providing a cover, a benefit, to the marijuana problem. And that just suddenly struck him. I'm sorry? That just suddenly struck him. Well, he realized that. Yeah. And it can't be clear error for the court to find the story implausible. But I don't, I mean, the court had specific problems with the story. Well, the prophet, just because the prophet in written down said A, B, and C, if the court didn't believe it, he can do that. He can say, I'm sorry. And he did say it. He said it's implausible. Well, he went through seven specific things, four of which are specific to Ms. John's hearing testimony, three of which are. And then he addressed four specific things. And the one that we're talking about right now, why they came to this country, isn't part of the offense in relevant conduct. That's part of the backstory. It's not something that is an obligation to provide truthful and complete information about. The obligation exists as to the offense in relevant conduct. If why they came to this country is somewhat different than. . . Why do you say that's not part of the offense? If coming here was part of the plan to have them make these houses appear occupied, then coming here would be part of the conduct. But there's no proof of that. And the government floated that as a possibility. And they did that in their response to the prophet letter. They did that at the hearing. The judge didn't find that. He didn't find it. He found it implausible. It's just false speculation. He specifically found the whole story implausible. And he said that specifically. Well, what he says is. . . I don't believe anything you're telling me. A lot of what he didn't believe was about Ms. John. I didn't have any idea there was marijuana at the house. He said that's not just a misunderstanding. That's a flat-out lie. That's not Mr. Sheehan. When we're talking about why they came to this country, he never indulged in the hypothesis or speculation the government offered. And, of course, he could have. He could have said, well, I mean, there still would be a problem because there's not any evidence of it. But he could at least have. . . We'd at least have the issue joined. But he doesn't say that at all. And the marijuana. . . What they proved about the growing of marijuana occurred much later. They came here in 2016. We're talking about conduct in 2017 to 2018. Much later. So the notion that they came here for that purpose is something that's just not available as proof in the record. It's not proven. The overall issue I have is that some of these inconsistencies seem fairly de minimis. Did you take out the trash twice or three times or once and so forth? What's your best case about that to face this conviction, it has to be a material significant misstatement or omission? Well, I mean, this court in Altamira-Quintero said that it has to be as to the offense in relevant conduct. Yeah, that doesn't deal with the word material. Right. That's the word. When I read this, I thought, my gosh, these are pretty. . . I mean, the actual examples are really pretty minor. Right. Well, I think the Maxwell's case out of the First Circuit at 320 F. 3rd 34 about immaterial omissions don't work to deny you safety. But you have nothing in the Tenth Circuit on that. No. And we also have the Miller case on the Fifth Circuit where if you're untruthful about prior activities that aren't related to the relevant conduct. But that's a different story. Not related is truly a different story. My concern is these are related, but they're very minor. I wouldn't use the word trivial, maybe, but they're very minor incidents. Yeah, I think the Maxwell's case is certainly the best case we've cited on it. And the district court, of course, didn't rely on the number of trash bags that were taken, three versus two. You did find that Mr. Sheehan was much more truthful about that than his wife, but he didn't rely on that. And I think that gets also to the final point that the district court made, which was about the numbering sequence of the houses. Again, whether they lived in five houses overall or four really doesn't matter. In fact, they said more houses in the proper letter. His big concern was, well, when you took trash bags over to Steel Street, you were living on 138th Drive and you said you were living on Florida Street. But that's based on a misunderstanding in hearing testimony. The picture the prosecutor showed was about the first house they lived at in Colorado, which was 138th Drive. And Mr. Sheehan was clear at the hearing that the trash bag movement occurred at Florida Street, and the proper letter said the same thing. So for all these reasons, we'd ask the court, vacate Mr. Sheehan's sentence and remand for resentment without a specific statute amendment. Thank you. Thank you. May it please the court. Elizabeth Ford Malani on behalf of the United States. The fifth requirement under the safety valve statute is broad. It requires the defendant to tell everything he knows about his crimes and those who participated in the actions with him for purposes of a conspiracy. So what did the court say about that? It is the incompleteness of the statement that is more striking to me than some of these, did you live at this house at this time or that house when you were moving among the various houses? What did the district court say about the incompleteness? Did the district court say, I know there's more to the story and I believe the more is, and give us some flavor for why he thought there was an incomplete story? Certainly. So the court said, this is record volume three at 148 at the bottom, that the rationales provided by the defendants either make no sense or directly contradicted by the testimony here today or are impossible to understand. But he's talking there about the credibility of the story about why they came to the US and how they just accidentally, not accidentally, but just coincidentally came to Denver. I push back on that, Your Honor, respectfully because I think that was categorizing pretty much all of the testimony and the proper letter as well as the agenda of the record. I didn't hear anything in what you said that used the word incomplete or omissions or things like that. I think that that is part of impossible to understand. There are gaps here in the explanation that the defendants provided about why they came here, what they were doing, and what they knew when. What you've read is what I remembered and I think it does not, I'm not sure that the district court ever said this incomplete statement, woefully incomplete, and that's the omissions that I'm troubled with. And I'm not sure how much we can rely on that if the district court didn't. Certainly, Your Honor. I think that that was the tenor of the district court's finding, saying that it was impossible to understand because there were all these missing pieces. It is used the word missing pieces. I think that, you're right, Your Honor, that's true, but I think that that's what's implicit in what he said. And I think that that's really important. I would push back that the four topics that opposing counsel has focused his arguments on, that they pertain to minor topics. I do push back on that. First of all, with regard to the utility bills and money order, those are how the house was, the utility bills paid for the electricity so that the marijuana grow house could occur. There were thousands of dollars, which is obviously very unusual, that came out of trial. But if Mr. Sheehan knew about his wife paying these money orders, that obviously undermines their whole theory that, oh, we didn't ask questions because we wanted to continue to live rent-free. You're not living rent-free if you're paying thousands of dollars for utility bills. It's as simple as that. And I think that the district court recognized that there was enough evidence here for it to make a factual finding. I don't think it's fair to say they were paying the utility bills. The statement that she signed a check, but did that money come from her or where did that money come from? So we don't have any bank records in the record here. Right. So I don't think you can represent to us that they were paying those bills. But I think we don't know that for sure. We don't know that for sure. So I'm going to ask you to be precise about all this stuff. I mean, it matters. Go ahead. So I think that the record supported the conclusion that she obtained those money orders. And that was teased out at trial. And there are multiple reasons for that. One of them is that the district court made a factual finding and said the handwriting is similar. And I don't think that's clearly a release on the money orders versus the check that Mr. Sheehan's wife wrote. So there's the handwriting. As well, there's the similarity in names between the person who obtained the money orders and Mr. Sheehan's wife. There's also the fact that there was a misspelling on one of the money orders. And as teased out at trial, it's very unusual to misspell your own name, especially on a financial document for $1,000 plus. And then the last thing that I would point the court to is at trial. But all that misspelling, actually, tends to, I think, not corroborate your interpretation. Because it suggests that she didn't fill this money order out. She just signed a name to it was all she did. Right. By signing a different name to it and then denying that she obtained the money orders, therefore, the proffer was, in truth, incomplete on that topic. And then that comes as the district court recognized. That goes to the heart of their theory in the proffer letter and addendum, that they didn't know what was going on. And they chose to not ask particular questions because they just wanted to live rent-free. If they're the ones that are obtaining these money orders and paying toward the electricity, not only do they know what's going on, they're participating in this conspiracy. And it undermines their whole theory about why they didn't ask questions. So I think that one of the tricky things about this case and the record that we have in front of us is there are still missing holes. Did the district court ever state particularity of what was missing, that he was relying on the omissions as the reason for denying the safety of release? Well, he identified these four topics. No. These were things that were covered, were stated. Right. Did he ever identify things that were not stated and said, here's the missing things that I am holding you accountable for not disclosing? Yes. What did he say? He said that the money orders were ignored in the proffer letter. Because all the proffer letter said was that Ms. Zhang was asked to write one check at the direction of Ah Shen, and she did so. There was no discussion of money orders. The court also pointed out that the amount of the loan from Bank 4 was ignored in the proffer letter. It wasn't in there. Nor was the amount of the installment. And with regard to the order of houses, he talked about how the order differed from the proffer letter versus the testimony. And I think that we have to remember that we're on a clear error finding here. So reversal is only warranted if on each of these points that the opponent identifies that the district court's finding was just not plausible. The record didn't support it. And this court has a firm belief that an error has been made. And that's just not the case here. Not only would one finding here be enough to overcome his claim, but there are four bases here on which the proffer letter was just not truthful and complete. And I do want to talk briefly about the order of homes and why it matters. So in the proffer letter, there is a description of first living with Bank 4, then living at Bank 2's house, then living at Florence Street, then living at East 138th Drive, and then living at Glencoe. On its face, it would not seem to matter what order that the family lived in and when. But when we come back and consider the whole record of this case, the government, in the record, talked about how the East 138th Drive house had the markings of a disassembled row. If Mr. Sheehan and Ms. Song were living there when they delivered the trash bags to the stash house, it really undermines their claim that they had no idea what was going on. That means that they would have lived in two row houses during this entire stay in the United States. And still, they did not intend to participate in this, which they never admitted. So I think that the order of houses, it does matter. And the court relied on not only the proffer letter, which sets forth that order, but also the address on the couple's driver's license. And that matches up with the 138th Drive theory. I'm happy to answer questions about that, but I did brief that in the brief, and it's a little bit tricky. So I'm happy to answer questions about that. I also think that the number of trash bags in the basement door testimony, as opposing counsel concedes, the district court did not appear to rely on those in refusing safety valve relief. But they all go to credibility. The district court is making a credibility determination here. Is everything that you've provided us complete and truthful about your crimes and relevant conduct? And I think the fact that they wouldn't admit something that's, honestly, at this point, plain as day, the number of trash bag deliveries, goes to their credibility. And that was the case for both Ms. Zhang and Mr. Xian. While Ms. Zhang was far more forceful in saying only two, not three, Mr. Xian waffled and said, I don't know, maybe two, maybe three, maybe two times. So I think that this was all perfectly appropriate for the district court to consider. This court has emphasized the fact that those credibility determinations are difficult to replicate on appeal. And I think that here, there was certainly no clue error. There were several bases, a handful of bases, for the court to conclude that Mr. Xian had not provided complete and truthful information about his crimes as well as the relevant conduct. One final note I'll make on the loan, which I noticed in preparing for this oral argument. So there's a lot of discussion in the briefs about what the proffer letter said about the installment and whether or not we can read the proffer letter as saying that the amount of the loan was still outstanding because there was one installment. I don't disagree that an installment means the whole loan, but it normally means that the loan hasn't been paid. I would remind the court though that in the PSR, the defendants did not talk about this outstanding debt. So the question of what the proffer letter says gets a little murky. And then in preparing for oral argument, two paragraphs up from the discussion of the loan, the proffer letter says that there are still outstanding payments due on the second car. So the defendants were willing to say that there were outstanding payments due in one scenario, but they weren't willing to say that with regard to the loan from bank four. So I think that the court didn't clearly err in concluding that the proffer letter on this point was untruthful and or incomplete. And I haven't answered it. Counsel, can I just pick up on that point? Just a few moments ago, you said it's only necessary to find one incompleteness or one untruthfulness. Can you elaborate on that and tell us perhaps which you think is the strongest? I mean, you're essentially saying this court doesn't need to go through the list. Please help me with that. If I understand your question, Your Honor, I think that in order for the defendant to win in this case, you would have to conclude that each point was clearly erroneous. OK. So if you don't find one of the points is clearly erroneous, I think that the government necessarily wins, and it's an affirmance. The statute is a tell all you can tell requirement. So if one of these topics was incomplete or untruthful and it pertained to the crime in relevant conduct, that's what 3553 says is required in order for a defendant to be eligible for safety valve eligibility or in order to have his sentence fall below the mandatory minimum. So I think that if this court picks one point, then that's all it needs to do because, and therefore, the record would support affirming. To me, I think the strongest point is with regard to the money orders. And I think that's because that really went to the heart of why the defendants disclaimed any knowledge of what was going on here. So I think the financial aspect is really key here and very strong that Mr. Sheehan in this separately did not provide complete and truthful information about that. And that just really goes to the crux of how they participated in this conspiracy. And so do you have any authority other than, I guess you're reading the statute, but that says one instance of incompleteness or untruthfulness is sufficient to affirm this case? Not saying one instance, Your Honor, but I would point the court, I believe it's the Mattos case. So there were two defendants in that case. That's from the- What court? Pardon? What court? That's the First Circuit. The First Circuit. Talked about how there were two defendants. The findings with regard to one defendant were great. The findings with regard to the second defendant, not so good. But the record still supported other reasons that the district court hadn't considered. And I recognize that's not exactly what you're asking. But I think it goes to the point that if the record as a whole supports the incomplete, untruthful finding, then you can affirm. And that is what's proper here. Thank you. And I'm happy to answer any other questions. Of what significance is it? I thought you would argue that the fact that they were coming in and saying that they were not guilty of any crimes enters into the calculus. I think that that is a basis to affirm as well. And I recognize that this court hasn't said that in a published opinion. But I cited the Montijo Dominguez case, which I believe is yours, Your Honor. It's an unpublished case. And then there's a Herrera case from the Fifth Circuit that talks about that the district court, on appeal, the appellate court, upheld the safety ballot determination because the disclosures that have been made at trial or in a proffer were just inconsistent with what the jury found. And I think that certainly that can be found here. Well, they didn't testify here. So it's essentially their argument, if we don't testify in court and we finesse in my proffer statement that the court can't find them implausible. So I don't think that the cases have said that that sort of rule, this verdicts versus proffer, only applies when the defendant testifies. And I don't think it necessarily makes sense because in either case, you have disclosures by a defendant versus a finding by the jury. Here, the defendant said, I never helped anyone grow or cultivate marijuana. And I didn't have an unspoken agreement to help anyone. That's on volume three, page 85 of the record. But the jury found that he voluntarily involved himself in marijuana trafficking and intended to advance it. His proffer is in contradiction with what the jury found. So I think that is a separate basis on which this court can affirm. The district court expressly declined to make that conclusion. But I think that the record supports it. And I think that a reading of Montijo Dominguez could support it as well. If there are no further questions, I'd ask this court to adjourn. Thank you. Thank you. As counsel just said, the district court didn't say, I've heard everything in trial. And I've heard what you said. And given all of that, I don't believe you. The court never said that. It wasn't that your testimony was rejected by the jury, which is true in cases that the government relies on. In terms of the handwriting looking similar, the court did note that it didn't find, well, I believe they're the same. And what its issue was, was it was not addressed in the proffer. And it was when they said, as John said, I wrote one check to pay for utility bill. And then stressed that again in the supplement. And finally, in terms of the houses, the 138th Drive, whether they lived in one house with a grow operation for months, or whether it was two houses with a grow operation for months, doesn't matter. They admitted they lived in a house that they realized had marijuana in it. And that's what matters. The precise sequence and number of houses is irrelevant, not material. Thank you, Your Honor. Thank you. I want to thank counsel for their arguments.